Before the First Division, October 28, 1958

**No. 62402.**—Frank P. Dow Co., Inc., and Paramount Pictures Corporation *v.* United States, protests 293309–K and 293310–K (Los Angeles).

Oliver, Chief Judge: These two protests relate to motion-picture film negatives imported by Paramount Pictures Corporation. The collector assessed duty thereon at the rate of 2 cents per linear foot under the provision in paragraph 1551 of the Tariff Act of 1930 for "photographic-film negatives, imported in any form, for use in any way in connection with moving-picture exhibits, or for making or reproducing pictures for such exhibits, exposed but not developed." Plaintiffs claim that the merchandise is dutiable at only 1 cent per linear foot under the proviso in paragraph 1551, reading as follows:

\* \* \* *Provided,* That upon the importation of photographic and motion-picture film or film negatives taken from the United States and exposed in a foreign country by an American producer of motion pictures operating temporarily in said foreign country in the course of production of a picture 60 per centum or more of which is made in the United States the duty shall be 1 cent per linear foot, and the Secretary of the Treasury shall prescribe such rules and regulations as may be necessary for the entry of such films or film negatives under this proviso.

Seventeen entries are involved herein, covering an aggregate quantity of approximately 50,000 feet of film. Defendant's reference, in counsel's brief, to 100,411 feet is not acceptable. That amount appears to have been taken from an affidavit (plaintiffs' exhibit 3), which was received in evidence only to show compliance with customs regulations and "not to the condition contained therein" (R. 41).

Two witnesses testified. Both are associated with Paramount Pictures Corporation. The first witness was the director of the department of transparency and special photography effects. His duties include the preparation of scenographs of proposed pictures, which requires sending photograph units or teams to foreign countries where backgrounds are photographed. The exposed film is returned to this country and developed for ultimate use in producing motion pictures. The witness' testimony shows that Paramount Pictures Corporation is an American producer of motion pictures, that the film negatives in question

were of American origin, and that they were sent to a foreign country, where they were exposed by employees of Paramount Pictures Corporation in connection with the production of the motion picture titled "To Catch A Thief." Filming abroad was done "In the south of France in the area of Cannes, France, and Monte Carlo," and the picture was completed in the United States. The witness explained the work as follows (pp. 12–13):

> The director, the producer, and the two key stars, together with a crew, photographed estate shots and long shots, and some medium long shots in Cannes and Monte Carlo; and the great majority of the closer shots and medium close shots were completed in this country, using the backgrounds that were shot under my supervision, the purpose being for sound recording and for lighting and for consistency in lighting. It was possible to complete these shots because they were of long light duration, and taking the backgrounds we would always have light exactly the same as when the production shots were made. It made it possible for us to complete the shots here. Using transparencies, we add sound recording and lighting; we tint color on it, secure what we have, and that makes it possible for us to complete and make a perfect picture.

When the exposed film negatives were returned to the Paramount Studios in Hollywood, they were developed and then projected "on a translucent screen from the back of the screen" and photographed simultaneously with the principals. In this process, which the witness termed "transparency consistency photography" (R. 17), the principals in the foreground are photographed simultaneously with scenes of Monte Carlo and Cannes that form the background. Illustrative of this phase of composite photography is the picture (plaintiffs' collective illustrative exhibit 1) "showing a foreground shot in this country together with background shot in Monte Carlo, projected on a translucent screen and rephotographed in motion set with the foreground." Attached thereto is the related negative from which the print was made. There are also in evidence, as additional illustrations of the use of these film negatives, six sets of scenes from the motion picture "To Catch A Thief" (plaintiffs' collective illustrative exhibit 2). Each of these sets consists of a scene taken in the area of Cannes or Monte Carlo, a composite photograph showing the principals in the foreground and transparencies in the background, and the related negative of each of the prints. The witness identified the film in the completed picture "To Catch A Thief" as being in three categories, i. e., domestic footage, foreign straight footage, and transparency backgrounds. The statement is explained in the witness' concluding testimony on cross-examination, shown in the record as follows (p. 27):

> XQ. So that in each and every one of these films or pieces of films are reels of film that you imported, the background scenes which were taken and which were on the film were utilized behind the movie-set, or otherwise, in the ultimate finished picture; and, also, am I correct in understanding that scenes taken of the stars over there, individually, was also used in the finished picture "To Catch A Thief?"—A. That is correct.

Plaintiffs' second witness was the film editor of Paramount Pictures Corporation, who edited "To Catch A Thief." He described the duties of a film editor as follows:

> The Editor takes the film as it is shot, notes the light in different scenes and he cuts it, times it, and synchronizes the tracks so that as you see it in the theater it is seen as the finished product.

The witness testified that the total footage comprising "To Catch A Thief" is 9,572 feet, of which 4,292 feet are "Portrait," that was shot in the United States, exclusive of transparencies. The witness' testimony on the point is as follows:

> Q. Do you know the portion shot in the United States?—A. Yes, I do.
> Q. What was the amount?—A. 4,292 feet.

Q. What type of shot was that?—A. Portrait. That portion was shot in the United States, but that does not include the transparencies. The transparencies, of course, were shot abroad.

Q. Would you complete your answer as to that portion shot in the United States, but refer to what you call transparencies.—A. An additional 3,077 feet was shot at Paramount studios used with the transparent portion photographed abroad.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. Now, a moment ago when you, in answering my question as to the portion shot in the United States, referred first to 4,292 feet and then 3,077 feet. Just so I will be clear on the matter, the 3,077 feet was the portion or set of transparencies plus the acting as done in the United States?—A. That is correct.

Cross-examination developed that 2,203 feet, the balance to make up the total film (9,572 feet) comprising "To Catch A Thief," is "straight cuts or foreign film, shot abroad." (P. 36.)

There is no dispute between the parties with respect to the different amounts of footage, as set forth in the foregoing outline of the record before us. The disagreement lies in the interpretation to be given to the 3,077 feet which were "shot at Paramount studios used with the transparent portion photographed abroad." In this connection, Government counsel, in his brief, argues as follows:

* * * The remaining 3,077 feet were produced by using the film exposed in the foreign country as background or transparencies and having the characters perform in front of this background and thus take a picture of persons acting before a picture. It is thus quite apparent that the background or transparency must move while the actors are performing in front of it. It is not difficult to contemplate then that some 98,000 feet of background film was shown in order to take 3,077 feet of actors performing before this extensive background.

Defendant's theory, as expressed in the foregoing quotation, is not supported by the record. On the contrary, the testimony of the film editor on cross-examination is positive to the effect that 3,077 feet of transparency background appeared in the completed picture "To Catch A Thief." The pertinent portion of the witness' testimony is quoted:

XQ. Now, in the finished picture "To Catch A Thief," on the showing of it, the transparency backgrounds or part of the transparency backgrounds appear as part of the picture, don't they?—A. Yes, they do.

XQ. And they are part of the finished picture "To Catch A Thief."—A. You mean with the transparency background?

XQ. Yes.—A. Yes, they are.

XQ. And the transparency backgrounds, even though they are superimposed are part of the 9,572 aggregated feet of the film, is that correct?—A. Yes, and there are 3,077 feet of them in this particular picture.

On the basis of the record before us, we find that the completed picture "To Catch A Thief" was comprised of a total footage of film amounting to 9,572 feet, of which 4,292 feet were shot in the United States without the use of transparent background, 3,077 feet were shot in the United States with the use of transparent background, and 2,203 feet were shot in a foreign country. In determining whether or not "60 per centum or more" of the picture was "made in the United States," as contemplated by the proviso in paragraph 1551, *supra*, we turn to the case of *United States* v. *Metro-Goldwyn-Mayer Corp.*, 19 C. C. P. A. (Customs) 119, T. D. 45247. Although that case arose under the Tariff Act of 1922, paragraph 1453 thereof included a proviso which, so far as the present issue is concerned, is the prototype of the proviso in paragraph 1551 of the Tariff Act of 1930, as hereinabove set forth. Referring specifically to the statutory words "60 per centum or more of which is made," our appellate court, in the cited case, stated as follows:

Counsel for the Government has alluded, in the oral argument, to the use of the words "60 per centum or more of which is *made*" [italics ours], as they appear in the *proviso*, and it will not be inappropriate for the court to state its construction of the meaning of the word "made" as used in this connection. Plainly this word is not intended to apply to the mere fabrication of the picture which is finally produced, nor to the mechanical cutting or manipulation of the same; nor does it mean that at least 60 per centum of the physical labor utilized in the making of the film shall be the test. It seems a reasonable construction of the word "made" to hold that it shall be applicable to any film or film negative which has been exposed in the United States, and which is finally utilized in the picture which is produced and exhibited. A picture as exhibited, 60 per centum of the film of which was exposed in the United States, is a picture, in our opinion, 60 per centum or more of which was made in the United States. [Italics quoted.]

In the light of the foregoing judicial interpretation, the 3,077 feet of transparency background under consideration, being film that was exposed and is a part of the completed picture "To Catch A Thief," as exhibited in the United States, must be favorably considered in determining whether 60 per centum or more of that motion picture was made in the United States. Accordingly, we hold that 7,369 feet (4,292 feet plus 3,077 feet), or more than 60 per centum, of the film used in producing "To Catch A Thief," was "made in the United States," within the purview of the proviso in paragraph 1551, *supra*. The merchandise is, therefore, dutiable at the rate of 1 cent per linear foot under said paragraph 1551, as claimed by plaintiffs.

The protests are sustained, and judgment will be rendered accordingly.